# EXHIBIT G

EXHIBIT G

CONFIDENTIAL
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION
CASE NO.: 5:18-cv-157-JSM-PRL

YOLANDA ALDANA and LEYVIER HERRERA,
her husband, YOLANDA ALDANA as mother
and natural guardian of KEVIN MARTINEZ,
a minor, as mother and natural guardian
of ANTHONY MARTINEZ, a minor, as mother
and natural guardian of ALEJANDRO ALDANA,
a minor, and as mother and natural guardian
of KENNETH HERRERA, a minor,
         Plaintiffs,
vs.
PROGRESSIVE AMERICAN INSURANCE
COMPANY,

         Defendant.
_____/

                          Ver Ploeg & Lumpkin, P.A.
                          301 E. Pine Street, Suite 790
                          Orlando, Florida
                          Time 1:26 p.m. - 2:12 p.m.
                          January 22, 2019


                 CONFIDENTIAL DEPOSITION
                            OF
                      TODD PARNELL



     Taken on behalf of the Plaintiffs before Nancy N.
Foresteire, RPR, RMR, Notary Public in and for the State
of Florida at Large, pursuant to Notice of Taking
Deposition in the above cause.

CONFIDENTIAL

Appearances:

    STEPHEN A. MARINO, JR., ESQUIRE
    Ver Ploeg & Lumpkin, P.A.
    100 SE 2nd Street
    Suite 300
    Miami, Florida 33131
    305-577-3996
    Smarino@vpl-law.com
       On behalf of the Plaintiffs

    DANIEL A. MARTINEZ, ESQUIRE
    JENNIFER C. WORDEN, ESQUIRE
    Martinez Denbo, LLC
    2935 1st Avenue N
    Suite 2
    Saint Petersburg, FL 33713-8636
    727-894-3535
    Dmartinez@civillit.com
       On behalf of the Defendant.

Also Present:
    Mr. James A. Dodrill
    Corporate Claims Counsel, Progressive Martinez

I N D E X

Examinations                                                          Page

DIRECT EXAMINATION BY MR. MARINO                              4

WITNESS REVIEW LETTER                                        38

ERRATA SHEET                                                 39

E X H I B I T S

NONE

generally code it as file intervention.

Q    Can you tell me the circumstances that led up to your making a file intervention note on January 16, 2014, please.

A    Well, my first entry after my name is discussed with KXW -- that's Kathy Wallace -- and MPM, which is a Michele Malone Butler, who was Kathy's manager at the time.  So it would have been following my discussion with the two of them.

Q    Do you have a specific recollection of that conversation?

A    I do not have a specific recollection, other than just what my note says.

Q    So your recollection is refreshed by the note and nothing else?

A    It is, correct.

Q    You don't have a recollection, as you sit here, whether it was in person or telephonic?

A    It would the have been in my office, because I sit in the office with them.  But I just -- I know it was in person because I'm in the same office with them.  But, again, I don't have a specific recollection of this conversation.

Q    And we're going back five-plus years?

A    Right.

Q    I understand.  Your testimony is that because you and those two ladies are in the same physical office, you wouldn't have had a phone conference, you would have had a conference in your physical office?

A    Right.  And, generally speaking, if it is via telephone, I would generally mark that.  And that's become more prevalent just in the last year or two, just as people are working remotely more, at least at Progressive.  But at this time, in 2014, I was working in the office every day, and they were in the office with me.  So I know it was in person.  But, again, I don't have a specific recollection of it.

Q    And other than what's in these notes, you don't have a specific recollection of what was discussed or what decisions were made?

A    I do not, no.  Now, having said that, I do know that -- and, again, reflected by my notes, that I looked at some letters and things but, again, I only know that because the note says it, and that refreshes my recollection of those particular documents.

Q    Fair.  We agree that by January 16, 2014, Progressive had an idea of the universe of claimants?

A    I believe that to be correct.  So my note indicates that the attorney for the five claimants, I believe that to be the Aldana family that was in the

Nissan, had indicated they weren't in a position to make any commitments until his investigation is complete. And my note goes on to talk about a global settlement conference. I do remember that there were, initially, seven total claimants, two other claimants in addition to the Aldana family.

Q    And by about this time, you know that one of the seven claimants is the stepdaughter of the driver and the daughter of the insured vehicle owner, and she's not making a claim?

A    I know that I reviewed a letter that -- felt that I reviewed two letters. The first one was the initial global settlement conference letter, which offered up the entire policy limit to all seven claimants. Then once the stepdaughter and her stepfather -- or, I guess, her father, had indicated she was not presenting a claim, we re-offered the limits to the other claimant in the Aldana family.

Q    You wrote this note reflecting a conversation decision that was made. The question I'm asking is who, ultimately, makes the decision as to how we're going to go forward, given that there are five severely injured people, four of which are minors? On a claimant who has soft tissue injuries and is receiving Workers' Comp benefits, and a catalog of injuries that exceed the

policy limits overall, who made the decision to wait and not individually evaluate and make offers on the claim?

MR. MARTINEZ: Form.

THE WITNESS: That's, ultimately, the claims department's decision, Kathy, Michele and, you know, Michele's boss, for that matter. Again, they come to the attorneys for legal advice. In this case, legal advice on multiple competing claims. Review of letters, those sorts of things. But it's, ultimately, claims, the claim department's decision.

BY MR. MARINO:

Q I don't see the claims department decision in the notes. I see you making your note on the 16th of January. And then later the same day -- sorry, the next day. I apologize. The bottom of Page 52, Michele Butler sort of echoing that you and Miss Wallace and she had met and that you outlined our agreed action plan. Where would I go to find out who actually made the decision?

A I think I just told you.

Q Right. Is there some other part?

A It's claims' decision. I don't think there would be any other place, to my knowledge, other than the notes and the people that were there and had that

discussion.

Q    You don't remember anything beyond what you wrote down here from five years ago, and Miss Wallace doesn't remember anything beyond what's written down in the notes from five years ago.  Is there some other part of the claim file that would detail what decision is being made or is this the only place we can go to, to find out what the decision was?

A    Well, in this case, it's my understanding there were letters as well that went out to the attorneys, again, offering limits, requesting information, and offering to reschedule the global settlement conference when the Aldana family was in a position to consider settlement.  I think that that's reflective of the decision as well.  But the claim notes is, generally, where those discussions would be housed.

Q    The face sheet notes?

A    Correct.

Q    And the face sheet notes don't reflect any conversation with the insureds, correct?

A    Again, I reviewed my three notes.

Q    That was a poor question.  With regard to the January 16 and January 17 decision on how to go forward, there's no reference in your note to having incorporated the insureds or their attorneys in the discussion, only

you and Miss Wallace and Miss Butler, correct?

A   I don't see in my note a reference to a conversation with the insured.  But, generally, Kathy would be the person that would be having those conversations and would document that.  I do have a note here that DC, which is defense counsel, for the named insured has confirmed that the attorney for the other claimant, Ang, is fine with delaying the global settlement conference.

And I would presume Kathy has been having discussions with defense counsel and the insureds, but you're correct, my note does not specifically address a conversation with the insureds.

Q   Now we fast forward to July of 2014, and I want to say it's on Page 62.

MR. MARINO:  This is not Bates numbered.

MS. WORDEN:  I don't know why that particular version is not, but I can give you the Bates.

MR. MARINO:  I can tell you why it's not, because there are multiple sources of this, and you guys suffer from the copy of a copy of a copy problem.  I think I intervened somewhere in the chain before things got too copied.

MS. WORDEN:  MB405 is also that letter.

MR. MARINO:  Yeah, I have CF2808.

MS. WORDEN:  That's from the second claim file.  MB405 is the better version.

MR. MARINO:  MB405.

BY MR. MARINO:

Q     So this is pseudo marked MB405, and it's a July 3rd, 2014, letter.  This is written on July 3rd, comes in on July 7 to Progressive, at the Maitland -- is it MCO?

A     I think that's MCU.

Q     What does that mean?

A     I think it means medical claims unit, but I could be off by a little bit.

Q     Then there are notes about it on the 10th of July -- I'm sorry -- on the 17th of July of 2014, that on the next page reference another conversation with you.

A     Okay.  I see those.

Q     Now, you did not make a separate entry yourself into the face sheet notes with regard to that conversation, correct?

A     It does not appear so, no.

Q     Is there a reason why you would not do that?

A     There's not a specific reason.  Sometimes I'm the one that documents the conversation, sometimes it's the rep or the manager.  It can be a simple deal whether

we had it in Michele's office or my office, who has their computer in front of them.  I can't say, specifically, why I didn't document this particular conversation.

Q     You gave the advice to forward letter.  I guess that means send a letter back to Mr. Laird, responding to his July 3rd letter, advising that: "Progressive is not in a position to settle in advance of the global settlement conference, and that we look forward to receipt of the additional records/bills to document his client's injuries."

Did I read that correctly?

A     That's what the note indicates.

Q     Do you have a reason to disbelieve or disagree with the note, in terms of accurately reflecting your conversation?

A     Well, I seem to recall having reviewed the letter, which is also referenced in Kathy's note. "Letter forwarded to BTB for review."

Again, it's claim's decision on how to pursue different claims that come to me for legal advice on certain issues such as this.  Again, it's claim's ultimate decision on whether or not to pay Ang's claim or to not pay it.  But I don't have any reason -- I specifically remember reviewing a letter that indicated

that we weren't going to be in a position to offer Ang anything at that time, because we were still of the belief we could resolve all claims, eventually, on behalf of our insureds and get releases of all claims. So, again, that was a decision that while, ultimately, claims makes that, it's a conversation that we're having about what's the best thing to do.

Q    I guess I asked a poor question.  I apologize.

A    Probably a poor answer.

Q    You reviewed, at some point, in around July 17, 2014, you reviewed the document that's Bates numbered MB405, right?

A    I remember specifically, again, with the help of this note refreshing my recollection, that I reviewed a response letter to this.  I wouldn't have reviewed a response and helped with that if I hadn't seen the actual letter.  So, yes, I would have looked at the letter at some point around that time.

Q    Then you reviewed the proposed response to that letter?

A    Correct.

Q    And you gave the advice referenced here? This is an accurate recitation of the advice you gave?

A    Again, their clients, so -- I guess where I'm

getting hung up a little bit is advising, like I'm directing them what to do, versus advice. I give advice and it's their decision on what to ultimately do. So if that's characterized as what advice did you give them, yeah, I gave them the advice you can't pay this claim. But, again, it's their decision on whether they pay the claim or not.

Q    I don't want to quibble. That's what was written by Miss Wallace on the face sheet.

A    I don't dispute the face sheet note, no.

Q    Taking out the connotation of the word advised, the rest of it is an accurate recitation of the information you provided to Miss Wallace, true?

A    Again, I think the letter that she sends in response to this would be the most accurate, you know, recitation of what I said, because I looked at the letter. Like, I didn't look at her note until today. So I don't know if we've got the letter somewhere, but that would be the most accurate recitation of what I reviewed and I said was okay to send out in response to this letter.

Q    Was part of your advice or suggestion -- well, I'll ask my question the way I ask it.

Was part of your advice to consult with the insured and find out what the insured wanted to do?

A    Again, I don't have a note here, specifically.  But, yes, that's one of our obligations, is to speak with the insureds, keep them advised of settlement opportunities and those sorts of things.  In a situation such as this, again, there's not a demand here.  Just saying, "Hey, I don't think the other family is ever going to settle, so can we talk about settling."  So I don't know that this would have necessarily triggered that conversation.  If there's a demand that comes in, absolutely, send the demand to our insured.

Q    Well, July 3rd, 2014, we're almost seven months post loss, and you now have the least injured claimant soliciting a settlement offer from Progressive.  Fair?  Right there in the middle.

A    He says his client's willing to entertain a settlement offer.  So, sure, that's a solicitation of an offer, I suppose.

Q    And you'd agree with me that best practice would be to go to the insured and say, "Hey, we might be able to get out of this for two-and-a-half, what we reserved it for, five, maybe even ten grand.  You have these catastrophic injuries over here we haven't resolved yet.  If you can make this go away for five grand, do you want us to use five grand of your policy or do you want to kick in five grand and make this go

away, and then we can offer the money to the family?" That would be best practices, right, talk to the family about the opportunity?

MR. MARTINEZ: Form.

THE WITNESS: I would not agree that that would be best practice in this particular case, because your clients, as we all knew by this point, clearly had the most significant injuries. And there's nothing in this letter or from the Aldana family that indicated that we couldn't, some day, eventually, resolve all the claims. So, again, my advice in no way would have been to resolve the least serious claim to the exclusion or to the detriment of the Aldanas.

BY MR. MARINO:

Q I didn't say that, necessarily. If the guy is talking about he wants a million bucks, that's an easy conversation with the insured. If the guy is saying, "I'll take five grand to go away," that's a whole different conversation to have with your insured. You're facing what ends up being a $50 million exposure because we're hung up on including this guy in the global tender, and he only wants five grand. "You want to kick in five grand and allow us to do this?" That's a conversation you can have with the insured, right?

A    I disagree with the proposition or the -- in your question that says that the resolution of this claim in any way has any impact on the ability to resolve the Aldana claims.

Q    There's nothing in July of 2014 that stops Progressive, Miss Wallace, Miss Butler, you, from reaching out to the insureds, saying, "Hey, we've had an offer solicited from us, this is what the circumstance are.  What do you think we should do?  What's your input?"

Nothing to stop you from doing it, right?

MR. MARTINEZ:  Form.

THE WITNESS:  Correct.

BY MR. MARINO:

Q    And there's nothing in the file that indicates that conversation was had at all, correct?

A    Again, I haven't reviewed all the face sheet notes, so I don't know if those conversations were had or not.

Q    But that was not part of your advice, to go first call the insured and see what the insured wants to do; that's not part of what you advised, correct?

MR. MARTINEZ:  Form.

THE WITNESS:  Again, Miss Wallace was the one that documented that conversation.  So I can't sit

here and say whether I told her to do that or not. My advice, almost always, contains consultation with the insured. In this particular instance, I'm not certain that it rises to the level of a demand for settlement, which would necessitate and require such a conversation.

BY MR. MARINO:

Q    If a jury determines that this solicitation of an offer requires that Progressive consult with their insured, and Progressive didn't, then Progressive made a mistake, right?

MR. MARTINEZ:  Form.

THE WITNESS:  I'm not sure if I understand the question. Again, you know, I'm not seeing how the least significant claim has anything to do with, in the big scheme of things, with your client's claim, other than Progressive didn't want to do anything to prejudice the eventual recovery of your clients by settling out even for a few dollars with the least injured claimant, unless everyone agreed to it.

BY MR. MARINO:

Q    By July of 2014, the claim is seven months old, and it has not been resolved, right?

A    Correct.