**EXHIBIT J**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

CASE NO.: 5:18-cv-157-JSM-PRL

YOLANDA ALDANA and LEYVIER HERRERA,
her husband, YOLANDA ALDANA, as mother
and natural guardian of KEVIN MARTINEZ,
a minor, as mother and natural guardian
of ANTHONY MARTINEZ, a minor, as mother
and natural guardian of ALEJANDRO ALDANA,
a minor, and as mother and natural guardian
of KENNETH HERRERA, a minor,

Plaintiffs,

vs.

PROGRESSIVE AMERICAN INSURANCE COMPANY,

    Defendant.

_____/

DEPOSITION OF:  GEORGE A. VAKA

DATE:          Thursday, March 7, 2019

TIME:          1:52 p.m. - 3:14 p.m.

PLACE:         Vaka Law Group, P.L.
                 777 South Harbour Island Boulevard
                 Suite 300
                 Tampa, Florida 33602

Reported by:  Felita J. Fabricius
                CSR(KS)(MO), RPR-CP



Page 2

APPEARANCES:
MICHAL MEILER, ESQUIRE
Ver Ploeg & Lumpkin
100 Southeast Second Street
30th Floor
Miami, Florida 33131-2194
305.577.3996
mmeiler@vpl-law.com
APPEARING ON BEHALF OF THE PLAINTIFFS

JENNIFER C. WORDEN, ESQUIRE
Martinez Denbo, LLC
2935 First Avenue North
2nd Floor
St. Petersburg, Florida 33713
727.894.3535
servicesstp@civillit.com
APPEARING ON BEHALF OF THE DEFENDANT

ALSO PRESENT:

  Kay Fuller

Page 3

INDEX

TESTIMONY OF GEORGE A. VAKA

EXAMINATION BY MS. WORDEN........................... 4
CERTIFICATE OF OATH................................ 40
CERTIFICATE OF REPORTER............................ 41
ERRATA SHEET....................................... 42
WITNESS NOTIFICATION LETTER........................ 43

EXHIBITS

NUMBER         DESCRIPTION         PAGE

   (No Exhibits Marked During This Deposition)

--------

STIPULATIONS

   It is hereby stipulated and agreed by and between the counsel for the respective parties and the witness that the reading and signing of the deposition transcript be reserved.

Page 4

      P R O C E E D I N G S

   COURT REPORTER: Do you solemnly swear or affirm that the testimony you are about to give will be the truth, the whole truth and nothing but the truth?

   THE WITNESS: I do.

     GEORGE A. VAKA,

having first been duly sworn, was examined and testified as follows:

     EXAMINATION

BY MS. WORDEN:

   **Q  Good afternoon. Can you please identify yourself for the record.**

   A  Sure. George, middle initial A, last name Vaka, V-a-k-a.

   **Q  And you are a practicing attorney?**

   A  I am.

   **Q  And what area of law?**

   A  I do trial and appellate work, and the substantive areas are personal injury, mass tort, tobacco and insurance law.

   **Q  And where did you go to law school?**

   A  University of Florida College of Law.

   **Q  And what did you do after you graduated?**

   A  I began working as an associate attorney at a

Page 5

law firm called Fowler, White, Gillen, Boggs, Villareal & Banker in Tampa. I was an associate attorney there for a little over five years, became a partner in 1988, at which time I took over two practice groups, the appellate section of the firm and the insurance coverage section of the firm.

   And then I stayed there until 1999. I grew the department to 17 or 18 lawyers, at which point I resigned my position and opened my own law firm with two partners at the time. The name of the firm was Vaka, Larson & Johnson.

   I maintained that business entity for approximately 10 years, until I opened this law firm, Vaka Law Group, in late 2009.

   **Q  And at Vaka, Larson & Johnson, what was your primary practice area?**

   A  Primary practice area has always been insurance, either in the interpretation of the policies, interpretations of the statutes that regulate how insurance companies do business, whether it's 631, which deals with when the companies become insolvent, those types of things, 624 with respect to their behaviors, and those type of things, or just the interpretation of the contracts themselves.

   **Q  Since leaving Fowler, White, has your practice**



Page 6

been 100 percent for insureds or claimants against insurance companies, or have you represented insurance companies?

A   To the best of my knowledge, I have not represented an insurance company since January of 1999.

Q   And when you were with Fowler, White, primarily were you representing insurance companies or their insureds?

A   Almost exclusively in my practice.

Q   And since leaving Fowler, White, have you had an occasion to try a bad faith case?

A   Yes.

Q   How many times?

A   Less than a handful.  Two that immediately come to mind involved Richard Young.  It was a GEICO case that I tried for almost two weeks in federal court.

And then I remember one against Travelers more recently, in the last few years, in front of -- it was also a federal case, in front of Judge Lazzara.  And that case, I think, went for a week.

I believe that there were others closer to 1999.  I just don't remember them at this point.

Q   Okay.

A   But in the last few years, those are the two that stick out in my mind.

Page 7

Q   We're here today on the matter of Aldana and Herrera, et al., versus Progressive.

Do you know who initially contacted you in this matter to serve as an expert?

A   Yes.  It would have been Michal.

Q   And do you remember when that was?

A   I believe it was in November.  I'm sorry.  November of 2018.

Q   And in this particular matter, did you request to review any information that you were not provided?

A   No.

Q   Did anyone suggest to you what your opinion should be in this case?

A   No.

Q   What did you do to prepare for your deposition today?

A   I received the depositions of Ms. Aldana and Mr. Herrera.  I received those yesterday.  So I reviewed those.  I reviewed the written report that I've had prepared and submitted.

I reviewed my notes.  I reviewed the cases that I cited in my report, and I reviewed portions of the -- I think Progressive refers to them as claims notes, and correspondence from the various time frames while the claim had been presented.

Page 8

I also had discussions with Michal concerning the length of the deposition, anticipated length, but nothing regarding the substance of the case.

Q   Have you ever been disqualified in the area of claim handling before?

A   No.

Q   Have any of the cases where you opined that an insurance company acted in bad faith, as an expert, have any of those cases resulted in a finding of no bad faith, either by the Judge or a jury?

MS. MEILER:  Object to form.

A   I know of two matters in which I gave opinions for her partner, Mr. Moreno, in federal court, where those cases were adversely ruled upon.

I don't know what the final disposition of those cases were, whether they were successfully appealed.  I just don't know.

Q   Do you remember what the names of those cases were?

A   One was an Allstate case.  One was a GEICO case, that I remember.  I remember the facts of the cases.  I just don't remember their names.  I'm sorry.

Q   Do you have your notice there, or is it just your report?

A   This is just my report.

Page 9

Q   Okay.  Here's a copy of your notice.

A   Yeah.  Supposedly everything that you've requested is here, with the exception of one thing.

Q   And what's that?

A   We have not sent out a bill yet.  So I don't know the correct extent of the time.  The time is typically contemporaneously dictated by me, and then it gets typed up later in the week or the following week by one of the assistants and put in the computer.

But I don't have a calculation of the amount of time that I spent on the case, but other than that, I believe everything that you requested is here or doesn't exist.

Q   Okay.  Do you have a ballpark on the hours, or you have no idea?

A   I don't have a good idea.  I know that I was in trial beginning, I think, January 4th, and that was a three-week trial.  We finished up sometime after Martin Luther King Day.

And I know that I did not get into the meat of looking at the depositions, and all that other stuff, until after that trial had been completed.

And I think this was due the 15th of February.  So it was a pretty compact period of time of two to three weeks that I devoted the vast majority of time to



Page 10

working on that case.

MS. MEILER: Ms. Worden, I also prepared a thumb drive with all the documents that we provided to Mr. Vaka, as well as his retainer agreement and the e-mails transmitting documents to him.

The only exception is the e-mail from yesterday, sending Yolanda Aldana and Leyvier Herrera's deposition transcripts.

MS. WORDEN: Okay. Great. Thank you.

A    Now that I've thought about it, one of the names of those cases is Abruscato.

Q    Do you think the Allstate one was Kincaid?

A    It might have been. Is that the case with a motorcycle and a Jeep?

Q    Yes.

A    Then that might have been the one.

Q    Okay. The list of cases that is attached to your report for the last four years, do you have any updates since this was prepared?

A    No.

Q    And how about for your CV? Do you have any updates to that?

A    The -- I do know that we -- I actually went through it yesterday. So the Florida Super Lawyers should be updated to include 2019.

Page 11

Q    And which page are you on? I'm sorry.

A    Page 1.

Q    Okay.

A    And then in terms of -- I've not written anything. I've not spoken subsequent. I've not accepted any other honors, although I've been told I've been admitted to -- I don't know. Something -- Lawyers of Distinction.

I'm not sure what that is, but it's -- there seems to be a cottage industry of providing lawyers with accolades, and then charging them for the plaque that announces it.

Q    Do you have any updates to your speaking engagements?

A    No. Unfortunately, I've been in court too much the last seven or eight years to have the time to write or speak that I would prefer to do at times.

Q    With regard to your list of cases where you've been retained as an expert, if we could just take a quick look at that and talk quickly about those.

So Number 1, Pulte Homes, who retained you in that case?

A    Pulte.

Q    And the Rahdert, Steele & Reynolds case, who were you retained by?

Page 12

A    Rahdert, Steele & Reynolds.

Q    And the Florida Farm Bureau case, who retained you there?

A    Florida Farm Bureau.

Q    Was that a bad faith case?

A    It was.

Q    And in the Dever case?

A    The lawyers representing Mrs. Dever.

Q    Do you remember who that was? The attorney, I mean.

A    Alan McMichael.

Q    The Guarantee Insurance case, who retained you there?

A    South Florida Lawyers. I know that it was -- I honest to goodness don't remember. I remember what the case was about, and I don't remember if it was the brokers or the insurance company. If I was to guess, I would say it would have been the -- it had to have been the brokers.

Q    And in the Eres case, you were retained on behalf of Eres?

A    I was. And I have from time to time been retained as a fee expert, but I didn't list those because I didn't think that would be germane to what your inquiries were.

Page 13

Q    And in the last 10 years, have you been retained by an insurance company who is defending itself on a claim of bad faith to be its expert?

A    I have no recollection of that. I do have a recollection that I've never testified on behalf of an insurance company.

I don't know if I've looked over a case and said, I'm not interested, or I can't help you, or something like that.

But I know for certain that I have not testified on behalf of an insurance company in the last 10 years, other than Florida Farm Bureau in its case, where it was the plaintiff.

Q    That's why I drew the distinction of as a defendant.

Okay. Your report. What was your process for preparing this report?

MS. MEILER: Object to form.

A    I reviewed all of the materials that I said -- I identified that I reviewed in the substantive part of this report. I updated some of the legal research that I have previously done regarding the insurance company obligations of good faith and fair dealing. And then I used the -- this is -- the form of the report is kind of like a template. So I was very comprehensive, the first



Page 14

time I've done it, and I've just used the template thereafter.

So I would have updated whatever I needed to update with respect to myself and my experience. I would have had an assistant update the list we just talked about in terms of matters in which I have testified as an expert or at a deposition.

And then I would have, after having reviewed all of the material, taken notes. And when I review the material, the one thing that -- I was even surprised at myself in having -- when I was a defense lawyer, I used to read claims files daily.

And I was a little bit -- I don't know if amazed is the right word but surprised on how much more difficult it is to go through a claims file or claims notes with all of the computer shorthand. It took me a lot longer than I thought, but I tried to read every single word in the claims notes or claims file. So my emphasis and focus was in reviewing that.

I did take some notes along the way, many dealing with questions as I went forward or identifying who was who on the scorecard. But I would have then gone back through my notes through those portions of the claims file that I identified as significant, and then I would have prepared the report.

Page 15

Q   Did anyone assist you in preparing these substantive portions of the report?

A   No.

Q   And are there any drafts of the report that you have maintained?

MS. MEILER: Objection. Work product.

BY MS. WORDEN:

Q   Are there any substantive conversations that are not included in your list of materials that you relied upon?

And it wouldn't necessarily be a material, but did you have substantive conversations with regard to your opinions in the report verbally that are not documented somehow in the report?

MS. MEILER: Object to form. And to the extent that would make Mr. Vaka reveal conversations that he had that are protected by work product, I'd object on the basis of work product.

BY MS. WORDEN:

Q   Can you answer the question without getting into work product?

A   I will answer it this way. I obviously would have spoken about the preparation of the report in terms of the timing of it with Michal. I had no idea, for

Page 16

instance, that there had been a 15-day extension granted because I was frantically trying to get this done on a very short timeline, given my trial commitment.

I am certain that after I prepared the report, I would have forwarded the report to counsel because it's her responsibility to file it.

Would I have at some point in time disclosed what my opinions were? I'm certain I did. But beyond that, there was nothing of substance that we discussed, to the best of my recollection.

Q   Are there any opinions that you gave that are not included in your report?

A   No.

Q   Have you prepared any supplements to your report?

A   Since this was submitted?

Q   Correct.

A   I have not. But like I said, I just saw the depositions of Ms. Aldana and Mr. Herrera yesterday. So I would supplement what I've reviewed what they said. It doesn't impact, really, what my opinions are. And I'm sorry. I take that back. I was also provided with Mr. Atkinson's Rule 26 report.

Q   And so those are the three things, since you issued your report, that you've reviewed?

Page 17

A   Correct.

Q   And do any of them substantively change your opinions?

Do you have new opinions, or anything like that?

A   No.

Q   The cases that you include in your report in the section on basis and reasons for opinions, those cases, were they provided to you, or are they cases you already had in your possession?

A   All of those cases are cases that I already had in my possession.

Q   Okay. So start with your section on opinions. Can you please identify for me your first opinion.

A   I'm getting there. Okay. Yes. First opinion is Progressive did not exercise the requisite care, diligence and prudence as the liability insurer for Mr. and Mrs. Pyles in its handling of the claims arising from the collision of December 6th, 2013.

Q   And how did Progressive's actions fall short?

MS. MEILER: Object to form.

A   So Progressive was notified of this accident and recognized either the day that it was reported or within 24 to 48 hours thereafter that its insured vehicle was the rear vehicle in a three-vehicle



Page 18

accident. The vehicle directly in front of the insured vehicle was stopped at a red light, as was the first vehicle in front of it at the time of the impact.

So Progressive knew and acknowledged within the claims notes at that point in time that it appeared that the accident was 100 percent the responsibility of its insured driver, Mr. Pyles, and that there was no comparative negligence that would likely apply to Ms. Aldana, who was the operator of the vehicle that was stopped immediately in front of him.

Thereafter, within days of the accident and its having been reported to Progressive, Progressive recognized several things, that there were, I believe, four minors in the Aldana vehicle. One was a 22-month-old, who was removed from the scene by a helicopter, taken to Shands, who was reported to have been in a coma and nonresponsive.

I believe that he -- Mrs. Aldana was identified first as having fractured ribs, and then it was confirmed shortly thereafter in the claims notes she had also suffered from a lacerated liver. There was -- and forgive me. I don't remember all the names of the three boys. But the least seriously injured, is my recollection, had a fractured leg.

There was another young man who had fractured

Page 19

legs, and I believe he also had fractured hips and had to have a colostomy. There was another young man who had a fractured jaw, and I think he lost some teeth and also had a broken leg. So there were multiple seriously injured people in the Aldana vehicle as a result of this accident.

Progressive also recognized that there was only a policy that provided $250,000 per person and $500,000 per accident; in its claim notes, recognized that there was a potential claim for the passenger in the insured vehicle, who was a young lady by the name of Aubrey Heffler, who was Mr. Pyles' -- I hate this term, but it was his stepdaughter.

And then there was a claim by, I guess, a Mr. Ang, who was the operator of the vehicle who was directly in front of Ms. Aldana. Again -- yeah, Jaron Ang -- shortly after this loss was reported.

Certainly within 30 days, I believe the dates in the report, that Progressive knew that Mr. Ang was in the course and scope of his employment, had workers' compensation benefits available to pay for some -- if there were lost wages, pay for some lost wages and medical expenses and also had knowledge that his injuries were not life threatening or serious, that it appeared that he had solely soft tissue injuries at that

Page 20

time.

So the response at that time, again, shortly within the date that this accident was reported -- and I have the exact dates in the report. I didn't commit them all to memory.

Yeah. So December 16th of 2013 is when Progressive really gets a good idea as to what all of the injuries are. I think the claim was reported on the 9th. So within four days, they know -- yeah. Here we go.

Ms. Aldana had fractured ribs and a lacerated liver. She had been released from the hospital after three or four days in Ocala Regional. Her son, Kevin, had two fractured femurs, a fractured jaw, a fractured bone in his neck and knocked out two teeth and was still in the hospital. Her son, Anthony, had a fractured pelvis with two possible surgeries and was still admitted to the hospital.

Her son, Alejandro, had a fractured femur. He was the least injured and had been released from the hospital. And then her youngest son, Kenneth, had possible traumatic brain injury, paralysis and was still in Shands. And it was that same day that they learned about the extent of Mr. Ang's injuries.

The following day, at least according to the

Page 21

claim notes, the adjuster, Ms. Wallace, had explained this situation to her superior. She was advised to set up some reserves so that they could offer the policy limits, is what I understand the purpose of that was.

And she assigned various values to the various claims, none of which are particularly significant to me, other than she recognized that there were certain claims that were many multiples of the values that she assigned to two of the claims, which were Mr. Ang's and that of Aubrey Heffler.

At that point in time, Ms. Wallace requested these reserves. That exceeded her authority so she could make what she termed to be a global offer of the $500,000 to all of the claimants. That would be all seven of them.

The following day -- so we're now 10 days post-notice, first notice of the claim -- she contacts Mr. Batsel, who is the Pyleses' personal attorney, and is advised that they had the authority to exclude Aubrey Heffler from the global settlement offer.

And then a few days after that, a global -- a letter offering basically a global settlement to all of the claimants, all seven, was sent to the Aldanaes' attorney and to Ms. Aldana. And it requested that the claimants agree to an apportionment of the policy limits



Page 22

or to attend the settlement conference.

That settlement conference was unilaterally scheduled by Mr. Davis, who is an attorney with Cole, Scott & Kissane, I believe, in Orlando. And Mr. -- his name happens to be William Davis. Ms. Aldana's attorney was J. Ross Davis, which made it a little bit confusing reading the file because the claims handler also juxtaposed their names several times. So I was a little bit confused in the notes.

But in any event, on January 7th of 2014, Ross Davis, who was the attorney for the Aldana family, rejected the global offer of settlement at that point in time, indicating that the 2-year-old was still in the ICU in Shands.

The one thing -- and so at this point, the thing I was -- I would be critical of was including the minor Heffler in the pool of the claimants and directing correspondence to the representatives of the Aldana family, with the inclusion of Heffler in the pool of claimants for this global settlement offer, when Progressive had been explicitly advised by the attorney representing the family that this young lady had no claim.

At this point in time in the claims file, although there is an analysis by Ms. Wallace that these

Page 23

are bad injuries and the likely value of -- the collective value of these injuries is well in excess of the policy limits, there is not an independent analysis with reason to claim judgment pertaining to each individual injury, what the likelihood -- the likely verdict amount would be as it pertains to each claimant's injuries.

And there most certainly is no correspondence or evidence in the claims file of any conversations with the insureds, Mr. and Mrs. Pyles, about what their individual exposures may be. And more importantly, what Progressive may do to assist them to diminish those exposures.

So I mentioned that Progressive had hired William Davis, an attorney with Cole, Scott & Kissane. And I believe it was it on January 14th of 2014, he corresponded to Progressive -- and it looks like a letter, but I think it was sent by e-mail.

But in any event, it's in the correspondence file, in which he recommended that Progressive do three things, one of which included evaluate the claims separately and make individual offers without a global mediation. Progressive opted for the third of his available choices, which I think was do nothing for the next 20 or 30 days and come back and talk about it then.

Page 24

But irrespective of any of the other options, it's my opinion that Progressive had an affirmative obligation to independently evaluate these claims separately and to advise their insureds as to what the values or potential values or likely values of those claims would be in front of a jury and then to make recommendations to Mr. and Mrs. Pyles as to the best ways that they could go forward and try to minimize those particular claims and those particular liabilities.

That did not happen until January of 2016, which is when I believe the policy limits were offered or paid on behalf of Mrs. Pyles. And by that point in time, it was kind of too late. So I would have anticipated -- and then -- so as this case progresses, as each 20- to 30-day period rolls along, virtually the same letter offering to have a global settlement conference is sent out.

There is -- at no point in time is there a discussion with Mr. and Mrs. Pyles saying, look, we've independently analyzed these claims; it looks as if Mr. Ang's claim is the least significant of all of the claims; so would we have your authority to leave his claim out; would you agree to be exposed on that and allow us to make an offer of the $500,000 policy limits

Page 25

to the Aldana family.

That never occurs. There is no -- it's kind of like, okay, here's our Plan A. Our Plan A is we're going to try a global settlement conference. And when that is not successful, there is nobody who is saying, okay, well, this is what Plan B ought to be, except for Mr. Davis, who says on January 14th, hey, we should independently evaluate these claims separately and make individual offers to try to limit the liability.

Nobody at Progressive seems to take heed in that, and it seems to me that they believe that they can keep offering all of the limits to everybody. Let the claimants be the claims adjusters, and decide who should get what. Then by doing that, they'd satisfy their obligations of due diligence to Mr. and Mrs. Pyles, and I don't believe that's true.

**Q Does your experience lead you to your conclusion with regard to Opinion Number 1?**

A Yes.

**Q How?**

A So starting when I was at Fowler, White doing defense work, in the scenarios where there were multiple claims in which the values of the claims would likely exceed the policy limits and prior to the publication of the Faranis decision, it was frequently my advice to my



Page 26

insurance company clients that they ought to offer to pay a reasonable fee on behalf of their insured for their insured to obtain independent counsel, for them to evaluate the respective claims that could be asserted against their insureds and to give them independent advice on which claims to try to settle and what was the priority of those proposed settlements.

We would then, in conjunction with that, offer to have a meeting with a claims representative, the insured, the insured's lawyer that was retained and paid for -- retained by the insured but paid for by the carrier -- and myself, in which we would make recommendations -- we being the claims representative and me -- on behalf of the insurance company would make recommendations based upon our opinions of the values of the claims, advise the insured that if we used the money in certain ways, that it would diminish the ability to maybe settle other claims.

But we would look at -- what, there were four claims. And one was worth a million dollars, and one was worth 200,000, and one was worth 20,000, and one was worth 5,000. We would sit there and try to articulate to the insured person, who faced the liability, what was the likely outcome of settling or not settling any combination of those particular claims.

Page 27

That did not occur here at all. Even though Mr. Batsel was advising the insureds, that did not absolve Progressive of its independent obligation to advise the insureds.

Now, I haven't seen Mr. Batsel's deposition. I have no clue what he told Mr. and Mrs. Pyles. But even if he had given all the advice that I say should have been given, that in and of itself would not have absolved Progressive of its independent, nondelible duty to do so.

The other thing that I was critical of is that although it was clear to me that Ms. Wallace was documenting her file on a timely and periodic basis, there really wasn't any haste in attempting to get this matter resolved, as if it were her own personal case.

So we have this family out there who -- there is some correspondence in the file about, hey, can you advance $10,000 or some money towards their medical expenses; they're broke; their medical bills are approaching a million dollars. And the answer was, no, not without a release.

To me, that's a red flag. Hey, these people are really desperate. You better do something more than just sit in your chair and send out letters to try to get it resolved. You really need to be more proactive.

Page 28

Certainly, you need to ahead and independently evaluate what these cases are worth.

And it seems to me -- I mean, I've been doing this 35 plus years. You don't need to be a rocket scientist to figure out that the infant, the 22-month-old's case, who's got a brain injury and is paralyzed, is going to have, likely, the largest of value case because that's the person who's likely to have to have life care planning and have somebody to take care of them for the rest of their natural life.

Somebody, I would have thought, would have said, let's see if we can't get you a settlement for the payment on the policy limits on that one, not to say that that would or would not have happened.

I mean, I know that Mr. Davis, the Aldanaes' attorney, has testified that he believes that the case would have settled had the $500,000 been offered to that family. I have no reason to disbelieve him. I've never met him. I've never known him. I've never heard about him until this case. But nobody did any of that type of proactive adjusting that a case like this clearly, clearly requires.

**Q   Do you have any additional opinions that you can outline for us, or does your first opinion really encompass the whole thing?  Is there anything else?**

Page 29

A   Well, I mean, I think there's probably tributaries. My primary -- I mean, if I was to put it all in perspective, you have what the Supreme Court has referred to as a ticking financial time bomb with respect to this horrendous situation.

And it did not appear to me that this case was handled with the appropriate level of diligence that one would expect in this type of situation. So not only was there not the diligence, but there was not the independent -- I mean, let me back up.

There's the set -- there's the set of obligations that the Supreme Court arguably first recognized in Boston Old Colony talking about the responsibility of the carrier to keep the insureds informed about settlement negotiations, about telling the insured about the potential exposures, telling the insured what to do to avoid the excess exposures.

Then over the years, there are other decisions that add to that, decisions that recognize that the carrier has an affirmative obligation to initiate settlement discussions, recognizing that these duties are fiduciary in nature, recognizing that the insurance company has to give due consideration for the insured's interest, all of which gets wrapped up in a bow in Harvey.



Page 30

In Harvey, the Supreme Court says, you know what, even if you can comply with all of these duties and you can check the box next to it, that in and of itself is not sufficient; you need to look at the circumstances of the case and to see whether or not there was sufficient diligence given in trying to get this matter resolved on behalf of the insured.

So in this case, we have the failure to satisfy even the elementary obligations identified in Boston Old Colony. And then after that, you have the absence of, in my opinion, the diligence, the carefulness in the handling of a claim like this, which led to an incredible verdict, one that was probably likely.

Just so you know, from my opinion, I'm critical from the -- from here's the fundamental things you're supposed to do that weren't done. And thereafter, the motivation to get them done should have been there and should have been recognized and that those efforts should have been more diligent and were not.

Q    And beyond those two opinions -- although the second one is kind of, like you say, a tributary to the first -- are there any other specific issues that you would identify as opinions?

Page 31

A    If I haven't identified them in the report, then I would say, no. And just so -- I want to make sure I'm clear. These duties were individual to each, Mr. and Mrs. Pyles, not jointly.

So since they were both insureds and the nature of the liability against Mrs. Pyles may have been different than the liability against Mr. Pyles, it's my viewpoint Progressive had an independent obligation to go through all of these different functions independently with Mrs. Pyles and independently with Mr. Pyles.

Q    Are you saying that Progressive's obligation was to separately from each other go through each of the independent duties that you outlined?

A    Yes.

Q    And recognizing that they potentially could have different liability, as one of the reasons for that, is there any other reason why, you know, if they're sitting in the same room, you don't cover the same ground with them together?

MS. MEILER:  Object to form.

A    So as Progressive realized further downstream, it might have been able to extinguish the liability of one insured, while not being able to extinguish the liability of the other.

Page 32

I believe that there's case law that gives insurance companies -- liability insurance companies -- I think there's the Contreras case out of the Fourth District that recognizes that there may not be any type of financial penalty to an insurance company who extinguishes the limits on behalf of one insured to the exclusion of another.

I think that also goes back to Faranis.  I don't know that they're necessarily inconsistent because Faranis says, well, wait a minute; you need to look at all of the circumstances, and then you use reasoned claim judgment to determine which claims to settle and which ones not to settle.  So I think they are complimentary in that regard.

But they had -- her liability was as owner of the vehicle that was involved in the accident.  That liability was different than his potential liability, where he had drugs in his system and some other things that may have led to different considerations and different theories of liability.

Q    Are you aware in this case of whether that had been a request made by Mr. Davis on behalf of the Aldanas prior to the litigation being filed?

MS. MEILER:  Object to form.

A    What was a request?

Page 33

Q    A release of one and not the other, or being able to resolve on behalf of Mr. Pyles and not Mrs., and vice versa.

MS. MEILER:  Same objection.

A    Mr. Davis, while he was representing the Aldanas, to the best of my knowledge, didn't make any demands, other than for information, with the exception of the request -- let me back up.  If I'm not careful, I'll wind up being like the people I get mad at when I'm taking their depositions.

So I'm talking about global demand to settle or a demand to settle an individual's case.  There were requests made for payment of property damage, certain items of property damage.  And there were -- was at least one request made to advance $10,000 for the payment of medical bills.

I was talking about a demand to settle any individual or collectively the entire family's bodily injury claims.  Forgive me for not being precise.  I should know better.

Q    The materials that you brought with you today, the paper materials, how are they divided up, I mean, as far as like organized?

A    I can tell you that they were organized a lot better when I was the first recipient of them than they



Page 34

are or might be right now. So they were organized when I first received them.

There were, to the best of my recollection, two fairly large sets of documents that were provided on certain dates, and those were then placed into file folders based upon how they were organized from Ver Ploeg & Lumpkin's office.

So I believe that they were organized in terms -- there was correspondence in terms of date. There were the claims notes. There were actually two sets of claims notes, which were the same thing that were provided. I don't know if they got reproduced twice.

And then there were like a few pages that were not in one but was on the front of the other. There was miscellaneous. Others -- the claims standards. There were -- I forgot about that too. There were the seminar materials, the PowerPoint -- the prints of the PowerPoint presentations, which specifically dealt with multiple competing claims handling. There was things identified as chronologies. There were personnel files from various claims representatives and persons.

There were depositions of a variety of people. There are personnel files, as well, as I mentioned. There was the deposition notice for me, my report and my

Page 35

notes. There was the -- I believe, the Amended Complaint and the Answer to Defenses for that, Mr. Atkinson's disclosure. There's my retainer. And that's pretty much, I believe, it.

Q   Were the materials produced to you in an electronic format or paper?

A   I believe they were produced to us in electronic, but because they were so voluminous -- and I get headaches when I sit in front of a computer all day -- I printed them out.

Q   And the folders that they're organized into, were those based upon how they were produced to you and what they were called, or is that something of your organizational method?

A   I wouldn't say that it was an organizational method. I would say that I came back from trial, and that's how the file was waiting for me. So I don't have a better answer for that.

Q   In this case, there were requests made by Mr. Davis for the financial affidavits of the Pyleses'.

Did you see those requests?

A   I saw -- I saw requests. I don't know if I saw the whole universe of those requests, but I saw the requests.

Q   And did you -- or do you have any opinions

Page 36

with regard to those requests?

MS. MEILER: Objection. Outside the scope of this witness' expertise. He's here to opine on the prospective handling of the claim, not on plaintiffs' attorney's conduct.

BY MS. WORDEN:

Q   Well, to be clear, I wasn't asking about Mr. Davis' request, but rather, the fact that they were made and what Progressive did with them, and then the subsequent Pyleses' response thereto.

A   I don't have a criticism of Progressive for what they did with respect to the receipt of those requests by Mr. Davis.

Q   And, in fact, you would agree that -- or would you agree that requesting financial affidavits would be standard that Progressive would have to deal with with regard to a case of this severity and value?

MS. MEILER: Object to form.

A   So I haven't reviewed enough of Progressive's claims files to be able to testify as to what they would routinely do or not do.

Progressive many years ago was a client of mine. So I did review claims files 20 something years ago, but I have not reviewed one recently until this one.

Page 37

It is not uncommon, in my experience, for lawyers who represent injured people to seek financial information from the potential defendants.

Q   In your file materials, do you have a separate section for those communications you had with plaintiffs' counsel?

MS. MEILER: And I would just caution Mr. Vaka to only disclose those communications that are not protected by work product; for example, all of the communications relating to scheduling or transmittal of documents we have actually provided on the thumb drive.

And so I would just caution Mr. Vaka, if there are any privileged communications, not to reveal the substance of them.

A   I'm sorry. Can you repeat the question?

Q   Yes. In your paper file there, are the communications you had with plaintiffs' counsel, to the extent they're not privileged, are they over there easily accessible?

A   That assumes that they would be a written communication that would have been put on paper, as opposed to electronically.

So if there were e-mails, those have not been printed. But any communication that I would have had by



Page 38

way of letter or that or like my retention agreement, all of that should be in the file.

Q   And do you have a separate folder for those communications in that paper file?

A   There's one identified as correspondence. Whether it's all there or not is another issue.

Q   Well, if we could just take a few minutes.  If I could just take a look at it so if I --

A   Sure, absolutely.

Q   -- I have any specific questions, I can ask them now.

A   Yeah.  That's why I brought it.

(Discussion off the record.)

BY MS. WORDEN:

Q   Mr. Vaka, have we covered all of your opinions?

A   I believe we have, as articulated in my report.

Q   And do you have anything else to add that we have not covered?

A   Not to the best of my knowledge.

Q   Okay.  And I think we discussed this before, but just to make sure, you reviewed the plaintiffs' depos, Mr. Atkinson's report, and you have no changes to the opinions outlined in your report or any additional

Page 39

opinions based upon those materials?

A   I have no additional opinions based upon the three things that I have reviewed.  I would be interested to see Mr. Atkinson's opinion and his deposition.

Q   Okay.

MS. WORDEN:  I have nothing further.

THE REPORTER:  Are you ordering the transcript?

MS. WORDEN:  Yes.  E-tran only.

MS. MEILER:  I'll take a copy, e-tran only.

THE REPORTER:  And you said read?

MS. MEILER:  Yes.

THE REPORTER:  Read your copy?

MS. MEILER:  Yes.

(The deposition was adjourned at 3:14 p.m.)

Page 40

CERTIFICATE OF OATH

STATE OF FLORIDA:

COUNTY OF HILLSBOROUGH:

I, Felita J. Fabricius, CSR(KS)(MO), RPR-CP, Notary Public, State of Florida, do hereby certify that GEORGE A. VAKA personally appeared before me on March 7, 2019 and was duly sworn.

Signed this 18th day of March, 2019.

_Felita J. Fabricius_
_____
Felita J. Fabricius, CSR(KS)(MO), RPR-CP

Page 41

CERTIFICATE OF REPORTER

I, Felita J. Fabricius, CSR(KS)(MO), RPR-CP, Notary Public, State of Florida, certify that I was authorized to and did stenographically report the deposition of GEORGE A. VAKA; that a review of the transcript was requested; and that the foregoing transcript, pages 4 through 39, is a true and accurate record of my stenographic notes.

I further certify that I am not a relative, employee or attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

DATED this 18th day of March, 2019.

_Felita J. Fabricius_
_____
Felita J. Fabricius, CSR(KS)(MO), RPR-CP

